All right, you'll have to bear with the court. Let me see if I can see you. We'll see if we can get everybody introduced and get this format straightened out so we can go forward with orals. First of all, this is a consolidated matter. It is case 4130907 Adams County Property Owners and Others versus the Commerce Commission. It's also case 4130917 Edgar County Citizens versus the Commission. 4140218 Morgan Sanguine Scott County's Land Preservation and Others versus the Commission and 4140249 Macon County Property Owners versus the Commission. We have several attorneys appearing here today, and I think I'll start with the appellants. If you would each identify yourself, who your client is, and how many minutes you'll be speaking on oral arguments. Your Honor, this is Brian Kalb on behalf of the Adams County Property Owners and Tenant Farmers. I will be arguing for five minutes. Please call me. Thank you, sir. Good, my name is Edward McNamara. I'll be representing Morgan Sanguine Scott County Land Preservation Group. I'll be speaking five minutes on the record. Very well. Your Honor, Tim Rakey. I represent the Macon County Property Owners and I will speak in five minutes. Thank you, and... Good afternoon. My name is Drew Griffin, and I'll be representing the Edgar County Group, Edgar County Citizens. We're entitled to due process, and I'll pick up the balance over time. Five minutes. Excellent. Are there any other attorneys here for the appellants that need to be recognized for the record? Okay, seeing none. For the appellees, please. Your Honor, Matthew L. Harvey, Special Assistant Attorney General, appearing on behalf of the Illinois Commerce Commission. I will be taking seven minutes. Thank you. Your Honor, Bill Moran. I'm appearing here on behalf of rural, Clark, and Edgar County Concerned Citizens. I'm with my co-counsel, Mr. Joe Schroeder from Marshall, Illinois. We will be taking six minutes, and I will be doing the argument for our client. Very well, thank you. Any others? Good afternoon, Your Honors. Albert Sturdivant, appearing on behalf of Cameron Transmission Company of Illinois. I will be arguing for eight minutes. Okay, any other attorneys here for the appellees that need to be introduced for purposes of the record? Okay, I see none. The Court would like to extend its thanks to all of the attorneys for getting together with the Court and with each other to split up your time for oral argument presentation today. It's very much appreciated. And having said that, unless there are any questions, we, I believe, are ready to start with Mr. Kalb. Okay? Your Honors, Attorneys for the Appellants, Counsel for Appellees, may it please the Court. Your Honor, again, my name is Brian Kalb. I represent the Adams County property owners and tenant farmers, which are commonly known throughout my briefs as ACPO. ACPO is appealing the decision of the Commission granting a Certificate of Public Convenience and Necessity in an order dated August 20, 2013. The case was consolidated with other landowner groups for purposes of the appeal. While we all share the same record on appeal, our individual arguments turn on the individual facts and legal theories for each segment from Quincy, Illinois to Meridotia, Illinois, which travels mainly through Adams County and some others, but I'm focused on Adams County. My background of the case is set forth in my brief and the briefs of the other appellants as well as the appellees. In addition to the procedural history, I'm not going to detail those here, but what I will do is provide a brief summary of the background for purposes of my argument. Ameren Transmission Company of Illinois, which I refer to as Ameren, sought a petition seeking a Certificate of Public Convenience and Necessity on November 7, 2012, seeking permission to construct a 375-mile, 340-kV transmission line and related facilities from the Illinois border near Quincy to the Indiana border near Terre Haute. The easement, which is contemplated by the project, is approximately 150 feet wide. ATXI, or Ameren, filed its petition pursuant to Section 8-406.1 of the Public Utilities Act, which in this case required a decision from the Commission within 225 days. Now, as it relates to my argument, ACPO seeks reversal of the Commission's order. And our arguments are not based on the decision of the Commission as it relates to the need to the project. That's not our argument. Our argument is based on the decision of the Commission as it relates to the location of the transmission line. In that decision, the Commission evaluated a set of factors known as the Least Cost Means Factors, which are 11 criteria the Commission applied for my particular line segment. That criteria involves the length of the line, the cost of construction, impact on agricultural land, the number of impacted landowners, and the availability of existing rights of way, to name a few. ACPO contends that ATXI failed to demonstrate its route was the least cost means required by the Act. And, Your Honor, for purposes of my argument, I would like to refer to an exhibit. This exhibit is contained in the record in volume 13, C03006-C03016. And another map containing essentially the same diagram is on page 14 of the brief. The Commission's decision was based on these routes. And when I refer to these routes, I'm referring to a black line on the northern section of the exhibit, which is the ACPO Route 1. ACPO Route 1 is what I refer to it as. Ameren filed two routes, a primary route and an alternate route. The primary route is the blue route. The alternate route is the orange route. In my statute, Ameren had to provide those two additional routes. My contention before the Court is that the Commission erred by choosing a route that was other than ACPO Route 1. What the Commission did is they selected a hybrid route. And that contained a portion of the alternate route, which transferred into the primary route, which again is contained in page 14 of the brief. As it relates to these cost means factors, the ACPO Route 1 was $9 million less than Ameren's routes. It was three miles shorter than Ameren's routes, contained 15 less dead-end structures, and was recommended to the Commission and approved by the staff engineer, Greg Rockforth. So why did the Commission choose a route other than ACPO 1? The Commission, in its final order before the Court, the final order on August 20, 2013, noted a few reasons, which are the basis of my appeal. The Commission stated that there was a concern that the ACPO Route would traverse a neighborhood that it would impact six residences. However, the record indicates, and even referenced in the order, the ACPO Route 1 may potentially traverse an existing residential area, displacing six assumed residences. And because the expedited nature of this record, because the expedited nature of the proceedings, there wasn't a full development of whether the route would actually impact those six residences. So the only thing the Commission could do is make an assumption or a hypothetical. What we do know is that the Commission's decision actually does impact a particular client of mine, which is a dairy farm, which dairy calf buildings are 50 to 60 feet away from the transmission line, and that's in the record, and stated in the testimony of my clients, as well as becoming 230 feet away from another residential property. So there's no evidence that, no evidence in the record that anyone would actually be displaced by my particular route proposal or my clients. And Del Murphy, ETXI's... Counsel, you're already out of time, but if you'd just... Oh, I'm sorry. ...kind of watch the red light. Yeah, I see that. But if you want to bring your argument to a close... No, I will, Your Honor. And essentially what I see from the Court is a reversal of the Commission's order and a remand to the Commission to either accept the ACPO Route 1 or for further evidentiary development of the record. Thank you, Your Honor. Thank you, sir. It's Mr. McNamara, I believe. May it please the Court and Counsel. Judge, I represent... Judges, excuse me. I represent Morgan Sangman Scott County Land Preservation Group. We're a group of approximately 60 landowners in the area affected by the proposed line. We participated at all times in this proceeding before the Illinois Commerce Commission, and it's an exhibit here that has been admitted into evidence. The line that we're seeking the Commission to adopt on rehearing is a shorter line which goes directly along an existing 138 KB line between Maragosha and Pawnee. It's depicted in blue. The line the Commission adopted is a much longer line that snakes around to the south and eventually gets back to Pawnee. The line that we're seeking to have put into the record and eventually adopted is 18.3 miles shorter than the line the Commission adopted. It affects 15 farms versus 44 farms for the line that the Commission adopted. It affects 30 buildings versus 126 buildings for the line the Commission adopted. We give up. In any event, here are the construction cost figures. These are figures that AMRIN put into the record. Bottom line, the line that we wish to have enforced in this case costs $36,782,000 less to construct than the line the Commission approved. I would like to point out a very interesting fact, something that doesn't occur with any great frequency. Before the Commission, two gentlemen actively participated in the case. They were well qualified. They had no personal interest in the case. They were full-time employees of the Illinois Commerce Commission. They were employees that the Commission hired to give the Commission guidance as to how these cases should be decided. One of the gentlemen is a gentleman by the name of Greg Rockroar. He was mentioned prominently in my brief. Mr. Rockroar is an engineer. He worked at several utility companies before coming to the Commission. There's no question about Mr. Rockroar's ability, his dedication, his thoroughness. The other gentleman hired by the Commission to present the case to the Commission was none other than Mr. Harvey, who sits here today. Mr. Harvey is a true expert in public utility law. That's all he does. That's his thing. As the old saying goes, Mr. Harvey has probably forgotten more public utility law than any of us, the rest of us, will know, I should say. Throughout these proceedings, Mr. Rockroar testified and Mr. Harvey argued and briefed that the route that we advocate is the route the Commission should accept. Just how did you lose? That's what we're trying to fix. Facts as you're presenting to this court. The fact, the way we lost is Amron stated that they thought there would be possible problems with reliability because of the paralleling of the two lines. And I will get to that right now. Mr. Rockroar, I'll just summarize his testimony. There's nothing unsafe or inherently unreliable about having two transmission lines that do not serve the same function or area routed adjacent to each other. And he went on to quote a standard from the public utility law. He went on to say both lines will not be serving the same area, thus presenting a critical, not presenting a critical problem. He further went on to say both lines could be constructed in such a manner as to prevent the risk of one line interfering with the operation of the other. Are parallel lines commonplace? I believe they are. And in fact, when this line was initially, there was another line that Amron wanted. In fact, it was the primary line when this case was filed. It went on for some 15 miles directly east of Meredosha. So it is very common. Okay, I think that is in the record. You also are out of time, but I'll allow you another 30 seconds to a minute to bring your remarks to a close, please. Mr. Harvey made a very telling point with his final pleading before the commission. He stated that the, he talked about 18.3 miles of unnecessary line. He said that extra line at 18.3, approximately 30 percent longer than the line adopted by the commission, would be subject to the same wind, plane crash, whatever. He essentially said there's nothing to be gained, it's certainly not something not worth 36 million to be gained by avoiding parallel. Okay, thank you. Okay, next up is Mr. Rigby. Yes. Okay, please proceed. May it please the court. Your honor, your honors, I represent the Macon County property owners with regard to their appeal of the commission's decision approving the site of the Mount Zion substation. At the second rehearing, there were three options available for the Mount Zion substation that were considered. Options one and two were located within one-half mile of each other near Mount Zion. Option number three was located several miles away near Mawequa. The Macon County property owners favored option number three, believing that there were various problems associated with options number one and two. In the 11th hour of the proceedings, Ameren introduced a stipulation between Ameren and Mount Zion supporting option number two. Based largely on that stipulation, the commission selected the under section 8-406 of the Public Utilities Act for the issuance of a certificate of public convenience and necessity. 8-406.1 provides that the commission shall determine that the proposed construction will promote the public convenience and necessity only if the utility demonstrates that three requirements have been met. Two of the requirements are not in dispute here. In dispute is the requirement which provides that the utility must demonstrate to the commission that the proposed construction is necessary and is the least cost means of satisfying the service needs of its customers. Macon County property owners, your honors, have cited in its brief the case of Citizens United for Responsible Energy versus the Illinois Commerce Commission. In Citizens United, the court held that a consideration of the least cost means by the commission is absolutely critical. In that case, because the least cost means issue was not must be reversed and the cause must be remanded for further proceedings. Now here, your honors, there was disagreement over which site was the most appropriate location for the Mount Zion substation. The commission ultimately decided that because the community in Ameren had stipulated that option two was the appropriate site, the stipulation answered the question. But in awarding the site selection, the commission overlooked the fact that absolutely no evidence had been suggested in its brief that because the Macon County property owners failed to raise this issue at the evidentiary hearing, that the Macon County property owners have somehow forfeited their right to raise on appeal the commission's failure to make a least cost analysis. Ameren even goes so far as stating that when parties lack notice of a claim, they lack opportunity to develop the record. And because Macon did not present this issue until a proposed order had already been The statute places the burden of establishing least cost squarely on the utility, your honors. The burden is not on the interveners. Ameren did not lack notice of the statutory requirements under Section 8-406.1. Those statutory requirements form the basis or the roadmap by which Ameren sought approval of its certificates throughout these proceedings. Furthermore, Ameren did not by presenting further evidence regarding least cost. The statute is clear. Ameren had a duty to present that least cost evidence during the hearing. In its brief, Ameren admits having failed to meet its statutory duty. Ameren states that no party had introduced evidence suggesting that option one was the least cost option over option two. No party, including Ameren. Despite their efforts to redirect attention from their own failure, it was not the Macon property owner's obligation to address the least cost option or least cost at the hearing. If this Court prefers to consider Ameren's suggestion that Macon County property owners should have pointed out during the hearing that Ameren had failed to present evidence regarding least cost, then I encourage your honors to consider the fact that Ameren did not file the stipulation until December 16, 2013. That was not filed until testimony on knowledge of the stipulation prior to its submittal. Macon County property owners did not have an opportunity to address the stipulation during the testimony. Until that time, Macon County property owners believed that the various parties were actually advocating for a fourth site that's in the record, the Sulphur Spring site, and not options one or two. That being the case, Macon County property owners had no reason to believe that it was necessary that Ameren put on evidence to satisfy its statutory least cost requirements for option one site over option two site over option one. But again, your honors, that would not have been Macon County property owner's burden at the hearing. That was the utility's burden under the statute. So, your honors, this Court is required to reverse the commission decision if it determines that the findings of the commission are not supported by substantial... Are your clients now advocating option one? Is that your position here today? Yes, your honor. Actually, your honor, my clients continue to advocate option number three, but believes that there may be some reason that option one would be a least cost over option two. If you review our brief and look at the record, option one, or option two, rather, has to cross a road and adds several miles of additional line. So, again, my clients believe that the option one site would, in fact, have the least cost. Okay. Thank you, counsel. Thank you, your honor. Mr. Griffin? Yes. Okay. We won't start the clock on you until you get your email sent out. Maybe I can just do this. It might even be easier. Can you all see that? Yeah, that'll work. We'll stand up if we have to. Okay. May it please the Court. Your honors, my name is Drew Griffin, and I'm here on behalf of the group known as the Edgar County Citizens are Entitled to Due Process. Simply put, we're here today because our clients didn't get the notice we think that they should have received in order to have a meaningful opportunity to participate in the proceedings at the commission level. As such, we would like for this court to reverse the order issued by the commission that denied our ability to intervene, as well as denied our application for because we're not here necessarily to argue about specific points along the lines or elements that were considered, least costs, etc. We're here because, as you can see from the map, there are three lines here. The yellow line is the alternate route proposed initially by Ameren. The green line is the primary route initially proposed by Ameren, and then the reddish-orange dotted line that travels just north of the alternate route is the route that was selected by the commission. That was a route that was proffered by a group called Stop the Power Lines Coalition. After having initially presented that route sometime in May of 2013, they entered into a stipulation with Ameren and other parties supporting the alternate routes. They actually decided to forego their effort at even pursuing that route. However, it was still on the table for the commission to consider, and another group took up the cause and fought to have that route chosen. The concern here is, our landowners, the people that are on that dotted line that does not overlap with the alternate route, they didn't know the route had changed. They did not get the notice that was purportedly mailed to them. Were they entitled to that notice? We think they were, Your Honor. Primarily based on the history of these proceedings itself, when you look at the statute 8-4061, it is silent as to what type of notice landowners deserve if their land is being affected by an alternate route proposed. However, in the Illinois Administrative Code, it talks about what happens when a utility is applying for a certificate, how they are to send notice. They identify the landowners on their primary and alternate route. It then goes silent as to what happens when an intervener proposes a route. We know that interveners were allowed to propose routes. So, where we look to guidance, the closest we can get is the conversations had between the administrative law judges in this proceeding when people would show up to the hearings. So, in the transcripts that we've cited in our brief from those meetings, as well as from discussions between the ALJs and the Commission, were that if an intervener were to propose a route, then they would just follow the same procedure basically that Ameren had to, which was to put together a list of landowners affected by the proposed route, as well as a map to show what they would be. And then the clerk of the ICC was to send the notice. We don't know why our people didn't get the notice. We just know they didn't. At the time we figured this out, it was after the initial August 20, 2013 order was entered. The way they found out was because Ameren had sent them a letter dated September 6, 2013, by certified mail return receipt request. So, we know they got that. And all these landowners along this dotted line that did not overlap with the alternate route started to talk to each other and they realized what's going on. This isn't right. We didn't get notice of this. So, as soon as they could, they got together and we filed a petition to intervene. Well, counsel, let me ask you this. Let's back up a little bit. Opposing counsel says that your people did receive notice of the project. Do you agree with that? The project generally, we would have to agree with that. Notice of the proceedings and the routes under consideration. We would disagree that they knew about the proceedings because they did not get that special type of notice. So, the notice they had about the project was the general notice that there is an enormous project coming from west to east across the state that's going to construct power lines that are going to carry 340 kilovolts of energy across the state. When they go to the initial meetings that Ameren was supposed to hold prior to filing the certificate pursuant to the statute, they had the map of the primary route and the alternate route. But that would not have put them on any form of notice that their property would be affected because their property is not located on either of those routes. So, when they weren't mailed notice, like the people on the green and yellow lines were that were part of the Ameren routes initially submitted, because in addition to the public meetings, they got a set up. I see my time is expiring. I continue answering that question. You have successfully blocked the wire. I was thinking the same thing. I'm being honest. Good strategy. Yes, please bring your remarks to a close. So, to answer, I guess, to finalizing, answering Justice Holder White's question, it's they didn't get the notice that everybody else got. These people that were on the primary or the alternate route, in addition to knowing about the general meetings, they got letters mailed to them that they apparently received. We never got those letters mailed to our individuals so they didn't know to get a seat at the table to present the evidence. So, all we were left to do was try to intervene and try to file an application for rehearing. Procedurally, it looks goofy. We will admit that. But they've been deprived of their right to have a say in this matter. And not only that, if we got a chance to have a say, which we're not even here to argue about now, unfortunately, we would see that there are a lot of houses and structures that are affected. Thank you, Your Honor. Thank you, Mr. Griffin. Is Mr. Harvey next? I believe so, Your Honor. Okay. May it please the Court, my name is Matthew L. Harvey. I'm a Special Assistant Attorney General representing the agency, rather obviously, in this proceeding. I'm going to present an argument about the issue of notice and due process purportedly owed to landowners and certain constitutional issues. And my colleagues, Mr. Sturdivant and Moran, will address other issues. I think as an initial matter, it's important for this Court to understand the scope of the It gave Ameren, Illinois, a Certificate of Public Convenience and Necessity, or CPCN, for the need for the project, essentially was shown, and it authorized Ameren, Illinois, to build it. What the proceeding below didn't do was authorize Ameren, Illinois, to use eminent domain to seek condemnation of the affected properties. Well, is an eminent domain a foregone conclusion after the certificate is issued? Not necessarily, Your Honor. The parties could come to agreement. Ameren could move the line somewhat to accommodate landowner concerns. There could be any number of outcomes that would not result in an eminent domain action being brought. And are there additional requirements as far as notice and things of that nature that come into play with the eminent domain that are not necessarily in play at this point? I'm certain that eminent, and I apologize for calling it Ameren, Illinois. It is, in fact, Ameren or ATXI. Yes, it would have to comply fully with the Eminent Domain Act in the Code of Civil Code. So you don't view it as a significant strike against these landowners, that the fact the certificate has been granted? Well, in the sense that, I mean, I guess a significant strike in what sense, Your Honor? I mean, do they go in as eminent domain? Yeah. Not necessarily, Your Honor. I mean, the law is fairly clear. They can, you know, contest the, you know, raise whatever issues they want to raise in the eminent domain proceeding. I mean, this Court's decision in Illinois Power v. Lynn says that. Yeah, I believe there were a couple of Supreme Court cases that, I think, lend themselves to your argument. Certainly Egyptian Electric v. Commerce Commission, Your Honor. And I believe there is one other, but it's not leaping right to mind. But the fact is that the eminent domain proceeding is where the property interest is clearly implicated. And that's clear from the cases. And accordingly, the due process issues really don't arise in the proceeding from which this appeal is taken. And I think the Edgar County citizens have conceded that what they're asking this Court to do is essentially reconsider the doctrines that the Supreme Court has enunciated. And this Court's decision in Lynn. Now, turning to the specific notice required by Section 8406.1, that was fully complied with. I mean, and I think the Edgar County citizens, again, fully conceded that. Public hearings were held, notice by publication was given, and a website was established. And there's no suggestion that that didn't take place. Likewise, there is ample evidence that the commissions gave notice of the general proceeding to everybody involved. And the commission's rules call for that, and that was complied with. The issue that seems to, the Edgar County citizens seem to be taking issue with whether they individually got notice, and that presumes that they were entitled to it in the first place, which we submit is not the case. The record reflects that individual notice of a route modification was given pursuant to a notice issued by our clerk on January 31st, 2014. Our commission considered it in the course of was satisfied that our clerk had sent notice. Now, the Edgar County citizens further argue that due process was denied because they weren't permitted to intervene in the proceedings, and because they weren't granted rehearing. However, one of the requirements to intervene is you have to accept the record as it exists at the time of your intervention. And the Edgar County citizens, on the face of their pleading, didn't do that. They wanted the record entirely stricken, and the commission's decision stricken, as to their segment of the line. Now, the commission controls its own proceedings. Its decisions as to allow intervention are discretionary, and the abuse of discretion standard applies to that. So that argument is likewise infirm. There's one thing I'd like to address sort of out of my area of argument that Mr. McNamara raised. I did, in fact, represent the commission staff in these proceedings, and the commission staff is not the commission itself. The commission staff is a group of experts who work for the commission and try to recommend in a disinterested way what, you know, make recommendations to the commission as to what it should do. And in this case, it did make recommendations. I advocated in favor of those. They were not accepted. The commission found compelling evidence that they shouldn't be, and it's, as a matter of fact, it's entitled to deference on that. And with that, I will conclude my arguments and thank the court for its time. Okay. Thank you, Mr. Harvey. And now is it Mr. Moran? Correct, Your Honor. Bill Moran, and I'm here with my co-counsel, Joe Schroeder, and we represent rural Clark and Edgar County concerned citizens. To set the map, so to speak, we are in the same area that Mr. Griffin's clients are, Edgar County due process, which is the easternmost segment of the line from the Kansas substation to the Indiana line. I have two points I want to talk to here in this appeal. The first is whether the members of due process have a property right that's protectable pursuant to some cognizable law that's at interest here and to notice. Because Mr. Harvey talked about the property rights a lot, I thought I would start with notice. To understand what happened in this case, the statute requires that before the utility files its petition, it has public meetings, it sets up a website that has to stay in place throughout the entire project, and then it files its petition with detailed maps, specifications, and lists of landowners. Those landowners are given mail notice of the project. In this case, Amarin was required in their petition to set forth two alternative lines, a primary line and alternate line. My clients were on the alternate line. After the case was filed, there were a lot of interveners someplace. I think I read 80 interveners. The ALJ said, interveners, you too can propose lines. Though the rules for the commission don't talk about this, don't require it, we are going to require that you do the exact same thing that the utility had to do, and that is provide us with lists. There was another group in our area called Stop the Power Lines. They submitted two alternate routes with maps, with lists of individuals that were on those routes. The ALJs took that information, they entered an order, and they said those people on Stop the Power Lines alternate routes on its face, January 31, 2013, that those people listed were provided with notice of the two routes that Stop the Power Lines had tendered to be considered. Those went all the way through, we got to our it's two alternates, but they said they're still in consideration. So we, my group, supported those, as well as the staff of the ICC supported those. In the end, the ICC found that that was the least cost alternative, served the public necessity and convenience, and it made sense. My people lived on virgin The line that was adopted followed another existing corridor of lines for a significant period of time. Therefore, one of the things you haven't seen in due processes arguments here is an argument that, hey, there's something really screwy with this line, it's in the wrong place, it's not going to work there, it goes over a Civil War cemetery. None of that has been presented here. The only issue is notice. Therefore, it's our position that the face of the record, in this case, shows that they did receive notice. When they filed their petition to intervene, they were required to and did say that they would accept the record, the face of the record, as it was on the date that they intervened. Therefore, in this case, there's no question that they got notice. You then move to the constitutional side of the argument, the due process side of the argument. The point I'd like to make there is that they haven't cited one case, one statute, one precedent, law review article, anything that says that they have a property right at this stage of the proceeding. No precedent at all. Without that, they don't have standing here to make that argument. They don't get to go to the facial constitutionality of that argument, and therefore, all of their arguments must fail in this case. And that's what we'd request, is that this court deny their appeal in this case and affirm the ICC's route that it chose in this case in its entirety. Okay. Thank you, Mr. Miller. Thank you. Mr. Sturdivant? Did I pronounce that correctly? Or close, anyway? Thank you, Your Honors. Albert Sturdivant on behalf of Ammon Transmission Company of Illinois. Your Honors, one point I hope that in the discussion of the notice is clear. Irrespective of the argument about property rights, and I think both Mr. Moran and Mr. Harvey hit on this, the ICC had in place a mechanism to provide mailed notice to the utility proposed routes, and the LJs imposed that same mechanism to provide mailed notice to the landowners on alternate routes. The record shows that that notice was sent. So, you know, there was a mechanism in place, reasonably certain, to inform the process, as can be seen by the number of landowners intervening. I think that supports the due process. Turning now, Your Honors, to some of the routing questions. I'll start with some of the points made by the Macon County group. I think we should be clear regarding the substation Option 1 versus Option 2, there was evidence in the record of Option 1 versus Option 2. And the Commission's order said that it had considered the arguments of the other parties, including arguments regarding Option 1 and Option 2, for example, by the PDM group. But there was, Option 1 and Option 2 were quite similar. And so the overall support of the property owners acknowledges the Commission's base disorder on the fact that the village of Mount Zion, which is a municipality in the area, had stipulated to that location, and that was a reasonable basis to do so. Counsel for Macon County, in their arguments, talks about some of the different factors that they think should have been considered regarding Option 1 versus Option 2, for example, crossing existing power lines twice. And I think that really illustrates the point that those types of arguments were not raised until after the record was closed and the briefing was over. There was no opportunity for Ammon or the Commission or anybody to respond to those arguments with evidence, which is the basis of the waiver argument. Turning next, Your Honor, to the Adams County property owner, Adams or ACPO. Mr. Kalb referenced residences. And I think it's important to look at what the Commission says in its order about residences as one of the bases for rejecting the ACPO Alternate Route 1. The order says the Commission is concerned by the evidence, which appears to show that ACPO's Alternate Route 1 would traverse an existing residential area near Interstate 172, potentially requiring displacement of at least six assumed residences. That finding is supported by the record. The record shows that ACPO Alternate Route 1 would, in fact, traverse an existing residential area. HXI's routing expert testified as much. And you can see from the aerial photographs, so for example, Exhibit 4.2, Part 2, Page 2, quite clearly from the aerial imagery, how the ACPO Alternate Route crosses south of the intersection of Highway 172 and Highway 96 and follows Highway 96 along a residential subdivision area. And there's evidence to support the conclusion that the six residences would potentially have to be displaced, including the testimony of Ms. Murphy. And I would posit that the cross exhibits that Adams included in their briefs certainly illustrate the proximity to residences. Wasn't there evidence that more residents would have to be displaced under the line adopted by the Commission? No, Your Honor. The evidence supports the, I believe that there were within 150 feet of the line, there were nine more residences on the Alternative Route proposed by Adams, of whom six would potentially need to be torn down. So the evidence showed there were more homes that were likely to be displaced on the Adams Alternative Route. Mr. Sturtevant, could you comment on the parallel line analysis, the benefits and drawbacks in terms of the evidence presented? I think as testimony from Ameren witnesses that would have highlighted potential drawbacks. Yes, there was, Your Honor. So in both the direct case and the rehearing case, there was testimony from Ameren witnesses regarding the operational reliability problems associated with paralleling transmission lines. That witness was Mr. Hackman. In the rehearing phase, his was the testimony that the Commission found particularly convincing on this issue. There was other testimony. Generally, the other testimony was that the parallel transmission lines were not inherently unsafe, but Mr. Hackman pointed out that there were operational reliability problems, and the issue before the Commission was, if those problems increase, the more extensive your paralleling is. The problem with the Morgan Route is that 100 percent of the 57-odd miles of that route were parallel, and that's why the Commission, recognizing that there was a choice between shorter and lower cost and reliability, chose reliability. Your Honor, just returning briefly to the Adams point, and I think this applies to Morgan too, it's true that some of the routes were cheaper, and the Commission did not necessarily always adopt the cheapest route in dollar construction cost terms. But in each case, when they articulated reasons, resonances, extensive paralleling of transmission lines, it provides a sound basis for making that decision. Your Honors, I'd like to close just by saying in all the discussion of notice and the routes of the transmission line, it's important to keep in mind that this transmission project is a necessary and important project for Illinois. It represents a substantial investment in the state, and as the including enhanced reliability for places like Decatur, while the project will reduce the risk of electric outages. So this need is not being challenged here. Because the project is necessary, it has to go somewhere, not on the property of one landowner, on the property of someone else's. The Commission recognized this. They recognized that they were faced with difficult and challenging routing choices, and made those choices carefully based on the record. So the order should therefore be affirmed. Thank you, Your Honors. Okay, thank you. We didn't speak about rebuttal, but what is the game plan here, gentlemen? Your Honor, if we support, we'll take one moment to discuss the breakdown. Understood. Your Honor, Mr. Powell and Mr. McNamara are going to be amended, so there's going to be at least a few seconds, and then Mr. Perkins is going to be heard. But we don't need that. I'm going to do my best. Okay. We don't need a what now? What was that? We don't need that buzzer. We're going to do our best here. I kind of got blocked out a minute ago anyway, so. May it please the Court, to briefly respond to Mr. Stiervant, I have two issues on ACPO. One is the residences. The issue with the residences is the evidentiary record, and lack thereof is the finding of what the issue is with the residences. Donnell Murphy, their routing expert, testified she could not attest the accuracy of where the line would actually occur, and the Commission's finding only indicated that there's a potential or possibility that it could impact residences. So therefore, Your Honor, the staff engineer, Greg Rushworth, has found that there's no reason why ACPO route number one could be adopted. So therefore, instead of spending $9 million in additional funds for an alternate route, we contest ACPO, given all the overwhelming evidence in favor of it, should be the one that the Commission found that ACPO alternate one parallels an existing 138kb line, which ATXI suggests may present reliability operational maintenance concerns. Although the fact that ATXI does not have similar concerns at other locations along the Illinois Rivers Project is troubling to the Commission. So in one breath, the Commission finds it relevant that there may be reliability concerns, despite the fact that they're citing reliability concerns yet have several parts of the project that have paralleling. So, Your Honor, the Commission's decision is at odds with itself, and we believe it's against the manifest wit of the evidence. Okay, thank you. Judges, as Mr. Harvey states, the Commission's order is subject to great deference. Why is it subject to great deference? Because the Commission is the expert in the field. Who are the real experts in the field? The real experts in the field are Mr. Rockmore, who testified, and Mr. Harvey, who were lawyers, one was a political scientist, one was a community activist, and one was a guidance counselor. They hired experts to guide them, and they didn't in the order say why they rejected their own experts. I think that is critical. One other point I would like to make. Mr. Harvey, in his brief, states that it's a two-pronged, co-equal test. The line chosen must be shorter and least cost, and co-equally must be reliable. Now, and I don't believe that our line is not reliable, but let's assume Mr. Harvey's argument is right. Then it's got to be sent back to the Commission, because my line, without argument, is the least cost. So it should be sent back to the Real quick question, counsel. Suppose we ruled in your favor. What then happens? Very good question. It goes back to the Commission, and there are new hearings. The issues are more clarified. We know where we're coming from, and hopefully the Commission will get it right this time. Okay, does the additional time, does that jeopardize the project in any way? It does not jeopardize the project. Let me speak to this. There are two ways to get a certificate. One's called 406, one's called 406.1. Right, for me with the expedite. Okay, and in this case, the judges asked twice, asked the company twice, please convert it to a 406, and they rejected that suggestion. Now here we are. Okay. With a lot of people arguing about it. Just one aside. You've got to save your co-counsel a little time here. Are you last? I'm sorry, I'm losing track here. Okay. Your Honors, with regard to the Mount Zion substation, counsel states that option 1 and 2 are located close to each other, and counsel states that options 1 and 2 costs are quite similar. Option 2, crosses a road twice, involves several miles. I don't recall exactly how many, but several miles of additional line. But we don't know exactly what the costs are with regard to option 1 versus option 2, because by their admission, there was no showing of cost, of least cost. The Commission's defense of option 2 rests entirely on the community's acceptance, which was in the stipulation. The least cost showing is a basic requirement under 8-406.1, and for that reason, it should be demanded for a showing of least cost on option 1 versus option 2. Okay. Thank you. Drew Griffin again, Your Honors, Fragler County. Counsel, you're out of time. Shoot. I see that my time has expired. May I? I think you got a little additional time last time, but very quickly, please. Thank you. It will be. On the point of notice that was raised by Mr. Harvey and Mr. Moran, what we have is an indication that there's an entry in a docket that says the clerk sent the notice. There's no certificate showing that it ever made it there. Accidents happen. Things get lost in the mail. Things that are supposed to have been sent out don't always make it out. What we have is 14 affidavits that we were able to round up when we filed our petition, when we were filing our petitions after the order, stating that that letter from Ameren was the first time, from ATXI, was the first time those landowners on that route that was selected knew about the proceedings. If it's in that much dispute, it seems like the damage done to the property owners is going to be far longer lasting than the damage done if our landowners, our group, is allowed its 30 days or whatever it might be to have an opportunity to present its own evidence why they've selected a bad route. Briefly, just because Justice Turner and Justice Holder White were having this discussion with Mr. Harvey about the property interest, we do think there's a property interest that's there. And we'll say this, Mr. Moran did say that there was no authority cited for that proposition. I don't know that I can argue that. But a case that maybe, this is what Mr. Harvey was referring to, that escaped him, I don't know. Illinois Power vs. Land was a case talking about the property right attached to the condemnation process. It has to attach sooner because these proceedings basically say where the line is going. By the time we get to the eminent domain proceeding, we believe, Justice Holder White, it's too late. Now all we're talking about is the amount of compensation. We're not talking about an opportunity to be able to preserve your land. This land matters more than money to these people. And what they've been deprived of because of their lack of notice is an opportunity to present evidence why they shouldn't have to give up their land. So to say that a property interest isn't there, it's a legal fiction. Their land is marked for being taken. Thank you. Thank you, counsel. Thanks to all of you. You've been gentlemen. We appreciate it. You've done well in presenting your arguments. We will take the case under advisement. It is submitted and the court now stands in recess.